UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>SAMUEL CAMARGO,<br><br>Defendant. | Case No. 21-CR-70 (ABJ) |

**RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS COUNTS TWO AND THREE**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Response in Opposition to Defendant Samuel Camargo's Motion to Dismiss Counts Two and Three (ECF No. 67). As set out in greater detail below, defendant's motion to dismiss should be denied because: (1) Section 1752 does not require the government to prove that the restricted area was restricted at the Secret Service's direction; (2) Vice President Pence visited the United States Capitol on January 6, 2021; (3) Section 1752(a)(2) is not unconstitutionally vague; and (4) the rule of lenity does not apply.

**FACTUAL BACKGROUND**

The government relies on the statement of facts to set out the factual background relating to the Camargo's actions on January 6, 2021. *See* ECF No. 1. In summary, Camargo attended multiple rallies and joined rioters on the west side of the U.S. Capitol grounds. While Camargo was on restricted grounds, he attempted to gain entry to the U.S. Capitol building through the North Door. While holding his mobile phone to videotape his actions, Camargo struggled with U.S. Capitol Police to open the North Door that led to the North Appointment Desk of the U.S. Capitol building. Multiple U.S. Capitol Police officers were guarding the interior of the North door and stopped Camargo from entering the building. Camargo also proceeded to post a picture of his

1

hand holding a metal piece of an unknown structure from the U.S. Capitol building or grounds with the admission that he "got some memorabilia, did it myself." After the first indictment was filed, the government also found evidence of Camargo spitting on officers on the Upper West Terrace of the U.S. Capitol.[1]

## LEGAL STANDARD

An indictment is sufficient under the Constitution and Rule 7 of the Federal Rules of Criminal Procedure if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," *Hamling v. United States*, 418 U.S. 87, 117 (1974), which may be accomplished, as it is here, by "echo[ing] the operative statutory text while also specifying the time and place of the offense." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). "[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)). An indictment need not inform a defendant "as to every means by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976).

Rule 12 permits a party to raise in a pretrial motion "any defense, objection, or request that the court can determine *without a trial on the merits*." Fed. R. Crim. P. 12(b)(1) (emphasis added). It follows that Rule 12 "does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds" unless the Government "has made a *full* proffer of evidence" or the parties have agreed to a "stipulated record," *United States v. Yakou*, 428 F.3d 241, 246-47 (D.C. Cir. 2005) (emphasis added)—neither of which has occurred here.

---

[1] This evidence was disclosed to all parties and the government plans on filing a superseding indictment before the trial date.

Indeed, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.). Criminal cases have no mechanism equivalent to the civil rule for summary judgment. *See e.g.*, *United States v. Bailey*, 444 U.S. 394, 413, n.9 (1980) ("[M]otions for summary judgment are creatures of civil, not criminal trials"); *Yakou*, 428 F.3d at 246-47 ("There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context"); *United States v. Oseguera Gonzalez*, No. 20-CR-40 (BAH), 2020 WL 6342948 at *5 (D.D.C. Oct. 29, 2020) (collecting cases explaining that there is no summary judgment procedure in criminal cases or one that permits pretrial determination of the sufficiency of the evidence). Accordingly, dismissal of a charge does not depend on forecasts of what the Government can prove. Instead, a criminal defendant may move for dismissal based on a defect in the indictment, such as a failure to state an offense. *See United States v. Knowles*, 197 F. Supp. 3d 143, 148 (D.D.C. 2016). Whether an indictment fails to state an offense because an essential element is absent calls for a legal determination.

Thus, when ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment and more specifically, the language used to charge the crimes. *See e.g.*, *United States v. Bingert*, 605 F. Supp. 3d 111, 118 (D.D.C. 2022) (a motion to dismiss challenges the adequacy of an indictment on its face and the relevant inquiry is whether its allegations permit a jury to find that the crimes charged were committed); *United States v. McHugh*, No. 21-CR-453 (JDB), 2022 WL 1302880 at *2 (D.D.C. May 2, 2022) (a motion to dismiss involves the Court's determination of the legal sufficiency of the indictment, not the sufficiency of the evidence); *United States v. Puma*, No. 21-CR-454 (PLF), 2022 WL 823079 at

*4 (D.D.C. Mar. 19, 2022) ("In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment and, more specifically, the language used to charge the crimes") (quoting *United States v. Sunia*, 643 F.Supp. 2d 51, 60 (D.D.C. 2009)).

## ARGUMENT

Camargo's attacks on Counts Two and Three are all without merit and the Court should deny his Motion to Dismiss these counts.

**I.    As Courts Have Uniformly Held, Section 1752 Does Not Require the Government to Prove that the Restricted Area was Restricted at the Secret Service's Direction.**

Camargo argues that Counts Two and Three should be dismissed for failure to state an offense because the Secret Service did not designate the "restricted area" around the U.S. Capitol on January 6, 2021. ECF No. 67 at 5. However, nothing in the express language of Section 1752 requires that the U.S. Secret Service designate the "restricted area," and defendant's attempt to read such a requirement as implied in the statutory language goes against the common sense reading of the text and its legislative history, as all the courts in this district to address this issue, including this Court, have held.[2]

Section 1752 provides in relevant part:

(a) Whoever—
    (1) knowingly enters or remains in any restricted building or grounds without
        lawful authority to do so; [or]

---

[2] *See, e.g.*, *United States v. Oliveras*, Case No. 21-cr-738 (BAH), 2023 WL 196746, at *3 (D.D.C. Jan. 17, 2023) (collecting cases). *See also United States v. Griffin*, 549 F. Supp. 3d 49, 52–58 (D.D.C. 2021); *United States v. Mostofsky*, 21-CR-138 (JEB), 2021 WL 6049891, at *12–13 (D.D.C. Dec. 21, 2021); *United States v. Nordean*, 21-CR-175 (TJK), 2021 WL 6134595, at *18–19 (D.D.C. Dec. 28, 2021); *United States v. Andries*, 21-CR-93 (RC), 2022 WL 768684, at *12-16 (D.D.C. Mar. 14, 2022); *United States v. Puma*, 21-CR-454 (PLF), 2022 WL 823079, at *13-16 (D.D.C. Mar. 19, 2022); *United States v. Sargent*, No. 21-CR-258 (TFH), 2022 WL 1124817, at *9 (D.D.C. Apr. 14, 2022); *United States v. Bingert*, 605 F. Supp. 3d at 130-132 (D.D.C. May 25, 2022); *United States v. Rhine*, Case No. 21-cr-0687 (RC), 2023 WL 372044, at *7 (D.D.C. Jan. 24, 2023); *United States v. Griffith*, Case No. 21-cr-244-2 (CKK), 2023 WL 1778192, at *3 (D.D.C. Feb. 6, 2023); *United States v. Neely*, Case No. 21-cr-642 (JDB), 2023 WL 1778198, at *3 (D.D.C. Feb. 6, 2023).

>   (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;
>   …
>
> (c) In this section—
>   (1) [T]he term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—
>     (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting;

18 U.S.C. § 1752. Section 1752 also defines "restricted building or grounds" to include any posted, cordoned off, or otherwise restricted area "of the White House or its grounds, or the Vice President's official residence or its grounds" or "of a building or grounds so restricted in conjunction with an event designated as a special event of national significance." 18 U.S.C. §§ 1752(c)(1)(A), (C).

The language of Section 1752 contains no express requirement that the "restricted buildings or grounds" must be restricted by USSS for there to be a violation of Section 1752. Nonetheless, defendant argues that such a requirement is implicit in the statutory language. ECF No. 67 at 5. However, because the plain language of the statute is clear and unambiguous, reading the implied requirement provided by Joseph is unwarranted. Even if one were to look beyond this plain language, the legislative history of Section 1752 also weighs against Camargo's interpretation.

First, "absent from the text is any mention of a requirement that any specific entity must restrict or cordon off the area, let alone a requirement that only the Secret Service may be the restricting entity." *Andries*, 2022 WL 768684, at *14 (citation omitted). Section 1752 proscribes certain conduct in and around "any restricted building or grounds," *see* 18 U.S.C. § 1752(a), and it provides three definitions for the term "restricted buildings and grounds," *see* § 1752(c)(1),

5

including "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting," § 1752(c)(1)(B). Through a cross-reference, Section 1752 makes clear—and defendant does not appear to dispute—that "person[s] protected by the Secret Service" include the Vice President. § 1752(c)(2); *see* § 3056(a)(1). The proscribed conduct within a "restricted building or grounds" includes, as relevant here, knowingly and unlawfully entering or remaining, § 1752(a)(1), and knowingly and with intent to impede or disrupt government business, engaging in "disorderly or disruptive conduct" that "in fact, impedes or disrupts" "government business," § 1752(a)(2); and knowingly engaging in any act of physical violence against any person or property, § 1752(a)(4).

In short, Section 1752 "prohibits persons from knowingly entering without lawful authority to do so in any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting." *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 98 (D.D.C. 2019), *aff'd*, 831 F. App'x 513 (D.C. Cir. 2020). Where, as here, the words of the statute are unambiguous, "the judicial inquiry is complete." *See Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation marks omitted). However, under defendant's interpretation of Section 1752, there is an additional, implied requirement unstated in the statutory language above that any restricted area must be designated by USSS. There is no such requirement, nor is there any credible rationale why one should be inferred.

And while looking beyond the plain language is unwarranted here, *see United States v. American Trucking Associations*, 310 U.S. 534, 543 (1940) (stating that looking beyond clear statutory text is appropriate where the results would be absurd or demonstrably at odds with clearly expressed Congressional intent), the legislative history of Section 1752 in fact affirms the plain reading of the text that Camargo resists. *See Andries,* 2022 WL 768684, at *14 (finding that similar

"extra-textual considerations at best do not support [defendant's] reading [of Section 1752] and at worst undermine it"). As the defendant acknowledges, when Section 1752 was first enacted in 1970, USSS was part of the Treasury Department, and this original version of the statute explicitly incorporated regulations promulgated by the Treasury Department governing restricted areas. *See United States v. Bursey*, 416 F.3d 301, 306-07 (4th Cir. 2005) (noting that definition of restricted area required interpreting Treasury regulations). Specifically, subsection (d) of Section 1752 gave authority to the Department of the Treasury, which oversaw USSS, to "prescribe regulations governing ingress or egress to such buildings and grounds and to posted, cordoned off, or otherwise restricted areas where the President is or will be temporarily visiting." Pub. L. 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan. 2, 1971). However, when Congress revised Section 1752 in 2006, it struck subsection (d) from the statute, eliminating the requirement that "restricted building or grounds" be necessarily defined or designated by USSS or any other particular law enforcement agency. Pub. L. 109-177, Title VI, Sec. 602, 120 Stat. 192 (Mar. 9, 2006). In 2012, Congress further reinforced this interpretation by adding the definitional subsection (c) cited above, which provides the current definition of "restricted building or grounds." Pub. L 112-98, Title I, Sec. 2, 126 Stat 263 (March 8, 2012). Contrary to defendant's reading, the legislative history shows that Congress deliberately excised any requirement that a restricted area depend on any definition or determination by USSS.

Both the plain language and legislative history of Section 1752 show that there is no requirement, express or implied, that an area be restricted by a particular law enforcement agency, as courts in this district have unanimously held. *See United States v. Grider*, --- F.Supp.3d ---, 2022 WL 3016775, at *7 (D.D.C. July 29, 2022) (collecting cases) (internal quotations omitted) ("[N]othing in the statutory text requires the Secret Service to be the entity to restrict or cordon off

7

a particular area"); *Bingert*, 605 F. Supp.3d at 131 ("[D]efendants fashion a bizarre requirement, seemingly out of thin air: that only the Secret Service can designate an area as restricted [for the purposes of 18 U.S.C. § 1752]."); *United States v. Rhine*, No. 21-CR-687 (RC), 2023 WL 372044, at *11 (D.D.C. Jan. 24, 2023). Defendant's contention that Counts Two and Three are defective for this reason should be likewise rejected.

## II. The Vice President was Visiting the United States Capitol on January 6.

Camargo's argument that a Vice President cannot "temporarily visit" the U.S. Capitol Building—because he or she has an office there—is contrary to Section 1752's plain terms, purpose, and structure. The same argument has been rejected by every court in this District before whom it has been raised, including this Court. *See United States v. Rodriguez*, Case No. 21-CR-246-1 (ABJ), 2022 WL 3910580, at *16 (D.D.C. Aug. 31, 2022); *United States v. Williams,* Case No. 21-CR-618 (ABJ), 2022 WL 2237301, at *19 (D.D.C. June 22, 2022). [3] As this Court held: "This strained interpretation is inconsistent with both the text and the structure of the statute . . . This definition [of 'temporarily visiting'] obviously encompasses Vice President Pence's actions on January 6, 2021. He went to the Capitol with a discrete purpose: to certify the Electoral College votes, a process that by law is contemplated to take one day." *Williams*, 2022 WL 2237301, at *19 (D.D.C. June 22, 2022) (citing 3 U.S.C. § 15). *See also McHugh,* 583 F. Supp. 3d at 33-34 (reaching "a commonsense conclusion: the Vice President was 'temporarily visiting' the Capitol")*;*

---

[3] *See, e.g., United States v. Griffin*, 549 F. Supp. 3d 49, 52-58 (D.D.C. 2021); *United States v. Mostofsky*, Case No. 21-cr-138 (JEB), 2021 WL 6049891, at *8-*13 (D.D.C. Dec. 21, 2021); *United States v. Nordean*, Case No. 21-cr-175 (TJK), 2021 WL 6134595, at *4-*12, *14-*19 (D.D.C. Dec. 28, 2021); *United States v. Andries*, Case No. 21-cr-93 (RC), 2022 WL 768684, at *3-*17 (D.D.C. Mar. 14, 2022); *United States v. Puma*, Case No. 21-cr-454 (PLF), 2022 WL 823079, at *4-*19 (D.D.C. Mar. 19, 2022); *United States v. Bingert*, Case No. 21-cr-91 (RCL), 2022 WL 1659163, at *3-*11, *12-*15 (D.D.C. May 25, 2022); *United States v. Neely*, Case No. 21-cr-642 (JDB), 2023 WL 1778198, at *3 (D.D.C. Feb. 6, 2023).

*see also United States v. Andries*, No. 21-cr-93 (RC), 2022 WL 768684, at *16 (D.D.C. Mar. 14, 2022) ("Vice President Pence was 'temporarily visiting' the Capitol on January 6, 2021 if he went to the Capitol for a particular purpose, including a business purpose, and for a limited time only. Plainly he did. He went to the Capitol for the business purpose of carrying out his constitutionally assigned role in the electoral count proceeding; he intended to and did stay there only for a limited time."); *United States v. Puma*, No. 21-cr-454 (PLF), 2022 WL 823079, at *17 (D.D.C. Mar. 19, 2022) (stating that under the plain language of Section 1752, the Vice President "was temporarily visiting the Capitol on January 6, 2021: he was there for a limited time only in order to preside over and participate in the Electoral College vote certification.").

To determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). The verb "visit" means, *inter alia,* "to go to see or stay at (a place) for a particular purpose (such as business or sightseeing)" or "to go or come officially to inspect or oversee."[4] Either definition describes the Secret Service protectee's activities on January 6. Vice President Pence was physically present at the U.S. Capitol for a particular purpose: he presided over Congress's certification of the 2020 Presidential Election, first in the joint session, and then in the Senate chamber. While not specifically alleged in the indictment, two other Secret Service protectees (members of the Vice President's immediate family), also came to the U.S. Capitol that day for a particular purpose: to observe these proceedings. Furthermore, as President of the Senate, Vice President Pence oversaw the vote certification. Given the presence of the Vice President (and his family members), the U.S. Capitol

---

[4] https://www.merriam-webster.com/dictionary/visit.

plainly qualified as a building where "[a] person protected by the Secret Service [was] … temporarily visiting." 18 U.S.C. § 1752(c)(1)(B).

Camargo criticizes Section 1752's use of the terms "temporarily" and "restricted area," arguing those terms allow the Section 1752's reach to "expand[] and contract[] based on fluid, unidentified factors . . . [and] provides no parameters by which the ordinary person can discern when the Vice President is 'temporarily visiting' the Capitol and, in turn, know when the building is 'restricted' for purposes of § 1752(a)(1)." ECF No. 67 at 10. He also argues that the *McHugh* decision adopting the government's position—that Vice President Pence was "temporarily visiting" the Capitol Building on January 6, 2021—was based on "faulty logic" because it "rejected the ordinary person's understanding of what 'temporarily visiting' means when it comes to the Vice President[.]" *See, e.g.,* ECF No. 67 at 10.

However, these conclusory arguments ignore the reality of January 6, 2021: Vice President Pence's visit to the U.S. Capitol *was* temporary because he (and his family) traveled there to oversee and attend the Joint Session of Congress—a proceeding of limited duration; at the close of the proceeding, they left, thus confirming the "temporary" nature of their visit.

Camargo further argues that "the Vice President has a dedicated, permanent office reserved for their use in the Senate" and he therefore cannot temporarily visit his own office. *See, e.g.,* ECF No. 67 at 3-4, 8-10. But numerous judges have rejected this argument, and for good reason: Section 1752(c)(1)(B) defines the restricted area by reference to the location of the protectee—not his home or workplace. When Vice President Pence traveled to the U.S. Capitol on January 6 to oversee the Joint Session of Congress, he was "visiting" the building. And because Vice President Pence intended to leave at the close of the session, this visit was "temporar[y]." Moreover, the United States Capitol is not the Vice President's regular workplace; even if "there is some carveout in § 1752 for where a protectee normally lives or works, it does not apply to Vice President Pence's

trip to the Capitol on January 6, 2021." *See, e.g., McHugh*, 583 F.Supp.3d at 33-34 (citing various dictionary definitions of "temporary" as "for a limited time" and finding that the Vice President can "temporarily visit" the U.S. Capitol); *Williams,* 2022 WL 2237301, at *20 (emphasis in original) ("Defendant insists that the Vice President could not have been 'temporarily *visiting'* the Capitol on January 6th because he regularly *works* there, and because he was in fact working there on January 6th. But defendant's simplistic assertion ignores not only the ordinary meaning of the statutory language, but also the structure of the definition in question . . . The language in 18 U.S.C. § 1752(a)(1) and (2) is plain and unambiguous: the term 'restricted building or grounds' encompasses the United States Capitol, which the Vice President) was 'temporarily visiting' on January 6, 2021.") (citations omitted).

Such a "carveout," taken to its logical end, would undermine the government's ability to protect the President and Vice President by deterring and punishing individuals who seek unauthorized access to the President's or Vice President's location. It would restrict Section 1752(c)(1)(B)'s application to only locations outside the District of Columbia—on the view that any visit by the President or Vice President to a location within municipal limits cannot be "temporary" because they reside in the District of Columbia. It would provide more protection for Secret Service protectees in an airplane hangar or a park than in the Capitol Building.

In addition, under Camargo's construction, Section 1752(c)(1)(B) would not apply where the current President or Vice President temporarily stayed at their permanent residences in Delaware or California—on the view that such a trip would not qualify as "visiting." Nor would it apply to Camp David, where there is a presidential cabin and office. In another strange scenario, a restricted area could exist when, as here, the Vice President's family visits the Capitol (because they are Secret Service protectees without an office there), but not when the Vice President herself does. It therefore would afford a higher level of protection for the family of the elected official

than to the elected official herself. No support exists for creating such large and irrational exceptions to the statute's sweep. *See Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020) (noting that courts will avoid a "statutory outcome … if it defies rationality by rendering a statute nonsensical or superfluous or if it creates an outcome so contrary to perceived social values that Congress could not have intended it") (citation omitted).

Camargo's position also defies Section 1752's clear purpose. *Cf. Genus Med. Techs. LLC v. United States Food & Drug Admin.*, 994 F.3d 631, 637 (D.C. Cir. 2021) ("[I]f the text alone is insufficient to end the inquiry, we may turn to other customary statutory interpretation tools, including structure, purpose, and legislative history.") (internal quotation marks and citation omitted). In enacting Section 1752, Congress sought to protect "not merely the safety of one man, but also the ability of the executive branch to function in an orderly fashion and the capacity of the United States to respond to threats and crises affecting the entire free world." *United States v. Caputo*, 201 F. Supp. 3d 65, 70 (D.D.C. 2016) (quoting *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984)). To that end, the statute comprehensively deters and punishes individuals who seek unauthorized access to the White House grounds and the Vice President's residence—fixed locations where the President and Vice President live and work, 18 U.S.C. § 1752(c)(1)(A); and also any other "building or grounds" where they (or other protectees) happen to be "temporarily visiting," 18 U.S.C. 1752(c)(1)(B). Construing the statutory provisions together, Section 1752(c)(1)(A) and (c)(1)(B) protects the President and Vice President in their official homes and wherever else they go. Interpreting the statute as the defendant suggests would create a gap in Section 1752's coverage by removing areas, such as the U.S. Capitol, from protection. It could endanger the leaders of the Executive Branch even as they perform their official duties. That gap is both illogical and contrary to the statutory history of Section 1752, where, "at

every turn," Congress has "*broadened* the scope of the statute and the potential for liability." *Griffin,* 549 F.Supp.3d at 56 (emphasis in original).

The cases cited by Camargo—which involve either an arrest or conviction under Section 1752 at a place other than the U.S. Capitol Building—have no bearing here. *See* ECF No. 67 at 9 (citing *United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005); *United States v. Junot,* 1990 WL 66533 (9th Cir. May 18, 1990) (unpublished). All the relevant considerations—plain language, statutory structure, and congressional purpose—foreclose Camargo's cramped reading of Section 1752(c)(1)(B). Therefore, this Court should reject it.

### III. Section 1752(a)(2) is Not Unconstitutionally Vague or Overbroad.

Camargo argues that Section 1752 "contains vague and imprecise terms and phrases" –that fail to give ordinary people fair notice of the conduct it punishes and invites arbitrary enforcement. ECF No. 67 at 16. Specifically, he asserts that the statute is overbroad because "'impede or disrupt the orderly conduct of Government business or official functions' includes within its plain meaning acts such as pure speech, expressive conduct, and lobbying." *Id.* He also argues that "'within such proximity to any restricted building or grounds' provides no clear limit on where exactly the statute applies." *Id.*

This is also well-trodden ground in this District. Every judge to consider the language identified by Camargo has found that it is neither overbroad nor vague. *See e.g.*, *United States v. Rhine*, Case No. 21-cr-0687 (RC), 2023 WL 372044, at *11 (D.D.C. Jan. 24. 2023) (rejecting argument that 1752(a)(2) is overbroad and stating "by its plain text, the statute also is directed toward conduct, not speech" and noting that the statute contains several limiting provisions which narrow its applicability); *Griffith*, 2023 WL 1778192, at *4, fn 4 (rejecting argument that 1752(a)(2) is vague because it criminalizes conduct "within such proximity to a restricted area

13

when the government alleges that defendant was *within* restricted area). Additionally, as Judge McFadden held in *United States v. Griffin*, "[1752] does not invite arbitrary enforcement by criminalizing common activities or giving law enforcement undue discretion." 549 F. Supp. 3d 49, 57 (D.D.C. 2021). *See also*, *Griffith*, 2023 WL 1778192 at *3 ("Simply put, there is no statutory language susceptible of multiple meanings here. The relevant provision means what it says"); *Grider*, 2022 WL 3016775, at *7; *Puma*, 2022 WL 823079, at *3 ("This Court concludes that … 18 U.S.C. § 1752 [is] not unconstitutionally vague.") (Friedman, J.); *Bozell*, 2022 WL 474144, at *9 ("§ 1752 "is clear[,] gives fair notice of the conduct it punishes, and [does not] invite arbitrary enforcement."); *United States v. Nordean*, 579 F. Supp. 3d 28, 60 (D.D.C. 2021) (§ 1752(a)(1) and (a)(2) are "not unconstitutionally vague"); *Griffin*, 549 F. Supp. 3d at 57 ("This law is no trap awaiting the unwary."); *United States v. Caputo*, 201 F. Supp. 3d 65, 72 (D.D.C. 2016) ("18 U.S.C. § 1752(a)(1) is … not void for vagueness.") (Cooper, J.) Therefore, Section 1752 is not unconstitutionally vague or overbroad.

### IV.     The Rule of Lenity Does Not Apply.

As every other court to address this issue has concluded, the language of Section 1752(a) is unambiguous. Therefore, the Court need not resort to the rule of lenity. As Judge McFadden explained last year when rejecting nearly identical arguments that the rules of lenity and constitutional avoidance should apply as a result of Section 1752's purported ambiguity,

> [Defendant] invokes the doctrine of lenity and the "novel construction principle." Neither applies. Lenity is "a sort of junior version of the vagueness doctrine." It comes into frame only when a court has exhausted all canons of statutory construction and is left with only a coin flip to resolve "grievous ambiguity."
>
> As the Court has explained, Section 1752 is capacious, not ambiguous. [Defendant's] "ability to articulat[e] a narrower construction" of the statute does not trigger lenity. Nor has there been an "unforeseen judicial enlargement" of a longstanding criminal statute so that it operates like an ex post facto law. [Defendant] has allegedly violated a rarely charged statute, but that does not mean

the *construction* of the statute unfairly blindsided him. There was no prevailing practice of courts foregoing or rejecting the interpretation that the Government now advances.

*Griffin*, 549 F. Supp. 3d at 57-58 (citations omitted).

Judges of this district have rejected attempts to cast Section 1752 as "ambiguous." "§ 1752 'is clear[,] gives fair notice of the conduct it punishes, and [does not] invite arbitrary enforcement.'" *United States v. Bozell*, No. 21-CR-216 (JDB), 2022 WL 474144, at *9 (D.D.C. Feb. 16, 2022) (citing *United States v. Nordean*, No. 21-cr-175 (TJK), 2021 WL 6134595, at *19 (D.D.C. Dec. 28, 2021)). *See also Rodriguez*, 2022 WEL 3910580 at *18 ("The language in 18 U.S.C. § 1752(a)(1) and (2) is plan and unambiguous")' *Griffin*, 549 F. Supp. 3d at 57 ("this law is no trap awaiting the unwary.")). *See also*, *Neely*, 2023 WL 1778198, at *4, fn 1 (D.D.C. Feb. 6, 2023).

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that Camargo's motion to dismiss Counts Two and Three be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: /s/ Nialah S. Ferrer

NIALAH S. FERRER
Assistant United States Attorney
New York Bar No. 5748462
United States Attorney's Office
District of Columbia
(202) 557-1490
nialah.ferrer@usdoj.gov


/s/ Kaitlin Klamann
KAITLIN KLAMANN
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
IL Bar No. 6316768
(202) 252-6778
Kaitlin.klamann@usdoj.gov