**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-70 (ABJ)** |
| **v.** | : | |
| | : | |
| **SAMUEL CAMARGO,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Samuel Camargo to 12 months of incarceration, 1 year of supervised release, $500 in restitution, and a special assessment of $25 for each class A misdemeanor.

## I. Introduction

Defendant Samuel Camargo, a 30-year-old from Hollywood, Florida, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Samuel Camargo was convicted at trial to violations of 18 U.S.C §111(a) (misdemeanor assault) and 18 U.S.C. § 1752(a)(1). The government's recommendation is appropriate in this case because Camargo: (1) spat at officers on the Upper West Terrace; (2) threw an item at the officers; (3) was present at multiple violent breach points of the Capitol; (3) was in possession of a piece of the locking mechanism from one of the Capitol doors and bragged about it on social media; and (4) took videos and pictures at the Capitol and posted it on social media.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Camargo's crime support a sentence of 12 months of incarceration, 1 year of supervised release, $500 restitution, a special assessment of $25 for each class A misdemeanor.

## II. Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1 at 1-4.

*Defendant's Camargo Role in the January 6, 2021 Attack on the Capitol*

Camargo's Approach to the Capitol and Advance Up the Inaugural Stage

On January 5, 2021, Camargo traveled to Washington, D.C. from his home in Florida to attend the "Stop the Steal" rally. On January 6, the defendant attended the Rally at the Ellipse, and after listening to former President Trump's speech, Camargo walked to the U.S. Capitol, where U.S. Capitol Police officers and U.S. Secret Service had established a restricted security perimeter

around the grounds and building with signs and barriers, including metal bicycle racks and snow fencing. *See* Trial Verdict Transcript at 9. Camargo walked on the West Front and saw the chaos in the crowd around him as rioters chanted and fought police. He then climbed on top of the Inaugural stage and, shortly before 2:50 p.m., climbed the risers facing the police line on the Upper West Terrace.

<u>Camargo's Approach to the MPD Line</u>

At approximately 2:50 p.m., Camargo scaled down the wall of the Inaugural Stage onto the Upper West Terrace and approached a line of MPD officers attempting to hold back rioters from entering the building. Camargo stood up on a bike rack, spat at officers and threw what appeared to be a water bottle at officers. *See* Images 1-2.

*Image 1 – Still Image from BWC of Camargo Standing on A Bike Rack and Spitting at Officers*



*Image 2 – Still Image from BWC of Camargo Throwing a Water Bottle at Officers*[2]

Camargo's Assault of MPD Officer Dora Vandayburg

Camargo continued to approach the line of MPD Officers on the Upper West Terrace and joined rioters on the Upper West Terrace steps in close proximity to the line of officers. At approximately 2:51 p.m., Camargo spat at MPD Officer Dora Vandayburg. *See* Images 3-4. After he spat at MPD Officer Vandayburg, Camargo pointed and screamed at officers, yelling at them, "You know it was fucking rigged…. and you still defend it. You guys are fucked." *See* Exhibit 3 at 14:50:22 p.m. Camargo only moved away from the line after an officer extended a can of OC spray in his direction. *Id.* at 14:51:46 p.m. He continued to antagonize and distract these officers by walking up and down near the line and became close enough where an officer instructed him to move back. *See* Exhibit 4 at 14:53:00.

[2] Images 1-2 are still images from BWC video attached as Exhibit 1. The timestamp of the incidents is at 14:50:28 p.m.



*Image 3: Still Image from BWC of Camargo Spitting at Officer Vandayburg at approximately 2:51 p.m.*

*Image 4: Still Image from BWC of Camargo Spit on Vandayburg's Jacket and Hair*[3]

<u>Camargo's Approach to the North Door</u>

[3] Images 3-4 are still images from BWC video attached as Exhibit 2. The timestamp of the incident is at 14:50:03-04 p.m.

Camargo then traveled to the North Door of the Capitol building where, at approximately 3:25 p.m., he filmed himself grabbing the door on his phone while officers were attempting to secure the building. He later posted this video on his Instagram account along with a photo of a metal piece of the lock mechanism from that same door with the caption, "got some memorobioia, did it myself." *See* Trial Tr. 4/17/24 at 168; *see also* Images 5-6.



*Image 5 – Still Image from Camargo's Instagram Story of Camargo Holding the Door*



*Image 6 – Photo from Camargo's Cell Phone*

Camargo's Approach to the East Rotunda Door

At approximately 3:49 p.m., Camargo traveled to the East Front and approached the Rotunda Doors. Camargo filmed his approach to the doors and later posted the video on his Instagram account. In the video, the windows of the doors were shattered, alarms were ringing, and officers were behind the doors. While filming, Camargo called the police "fucking pussies" and told them "you gotta retreat." *See* Trial Tr. 8/8/24 at 10; *see also* Image 7.

*Image 7 – Still Image from Camargo's Cell Phone Video Near the East Rotunda Doors*

Camargo's Statements and Social Media Posts

After January 6, 2024, Camargo gave a podcast interview with "Sovereign Souls.' During the interview, Camargo admitted that he saw rioters fighting officers on the stairway leading to the Inaugural Stage (*See* Exhibit 5 at 25:38), he saw rioters get pepper sprayed (27:30), he climbed scaffolding and he was threatened with OC Spray by officers (28:33). Camargo also admitted to entering the Capitol grounds and while describing it he stated, "now it's criminal." *Id.* at 22:10.

## III. The Charges and Trial Convictions

On August 23, 2023, the United States charged Camargo by Indictment with violating 18 U.S.C. § 231(a)(3) and (2); 18 U.S.C. § 111(a)(1) (Count Two); 18 U.S.C. § 1752(a)(1) (Count Three); 18 U.S.C. § 1752(a)(2) (Count Four); 18 U.S.C. § 1752(a)(4) (Count Five); 40 U.S.C. § 5104(e)(2)(D) (Count Six); 40 U.S.C. § 5104(e)(2)(F) (Count Seven). *See* ECF No. 78. Prior to trial, the government moved to dismiss Counts Five and Seven. At trial, Camargo was convicted of violating 18 U.S.C. § 111(a)(1) (Count Two) (misdemeanor assault); and 18 U.S.C. § 1752(a)(1) (Count Three).

## IV. Statutory Penalties

Camargo now faces sentencing on Counts Two and Three. On both counts, he faces up to one year of imprisonment, one year of supervised release, one year of probation, a fine up to $100,000, and a special assessment of $25 on each count.

## V. The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

Count Two: 18 U.S.C. § 111(a)(1) —Assaulting, Resisting or Impeding Certain Officers (misdemeanor)

| Base Offense Level | 10 | U.S.S.G. § 2A2.4 |
|---|---|---|
| Total | 10 | |

Count Three: 18 U.S.C. § 1752(a)(1)—Entering and Remaining in a Restricted Building or Grounds

| Base Offense Level: | 4 | U.S.S.G. §2B2.3(a) (trespass) |
|---|---|---|
| Specific Offense Characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted buildings or grounds." On January 6, 2021, the U.S. Capitol and its grounds were restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Total | 6 | |

*Grouping*

Under U.S.S.G. §3D1.2(a)-(c), "closely related counts" group. The victim of Count Two is MPD Officer Dora Vandayburg (Count Two) and the victim of Count Three is Congress, and neither count contributes to the specific offense characteristics or other adjustments to the other count. Accordingly, the counts do not group. Pursuant to U.S.S.G. § 3D1.4(a), Count Two, as the count with the highest offense level (10) receives 1 unit and Count Two (offense level 6), receives 1 unit as well. Pursuant to U.S.S.G. § 3D1.4, those 2 units add 2 offense levels to the offense level for Count Two, resulting in combined offense level of 12.

U.S.S.G. § 4C1.1 provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. U.S.S.G. § 4C1.1. Section 4C1.1 does not apply in this case, for the following reasons: the defendant used force and violence when he spat at different officers, threw a bottle at them and was aggresive towards the police line on the Upper West Terrace. At minimum, Camargo yelling and standing on a bike rack constituted a threat of violence in which Section 4C1.1 would not apply. A credible threat of force was defined

by Judge McFadden as "a believable expression of an intention to use physical force to inflict harm." *United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 6. When examining whether the defendant's conduct posed a credible threat of violence, courts can consider the totality of the circumstances surrounding that conduct:

> "In evaluating whether credible threats of violence were posed by the defendant's offense conduct, to my mind, the context matters very critically. In other words, evaluating a defendant's offense conduct requires examination of all the factors of the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions. So the fact that this defendant is not personally charged with assaulting or attacking officers is, therefore, not sufficient to make him eligible for the zero criminal history score offense-level reduction."

*United States v. Andrulonis*, No. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12. When looking at the totality of Camargo's conduct, it is clear that his actions posed a credible threat of violence. During the midst of an ongoing riot, the defendant spat at officers, threw a bottle at them, and decided to continue to approach them to yell and scream at them. Camargo's actions in the context of a riot where officers were outnumbered and chaos was all around them, show a threat of violence towards officers.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.

The U.S. Probation Office calculated Camargo's criminal history as category I. PSR at ¶ 78. Accordingly, the U.S. Probation Office calculated Camargo's total adjusted offense level at 12 and his corresponding Guidelines imprisonment range at 10-16 months. PSR at ¶¶ 55, 78.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## VI. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 12 months of incarceration, 1 year of supervised release, $500 in restitution, and a special assessment of $25 for each class A misdemeanor.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while

staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Camargo's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

One of the most important factors in Camargo's case was his continuously aggressive approach towards officers throughout the Capitol grounds. He scaled down a wall and threw a water bottle and spat at officers. He continued to approach the line of officers and spat at another MPD Officer, Officer Dora Vandayburg. He then continued to antagonize officers on the Upper West Terrace by cursing and yelling at them. After having an officer point pepper spray at him, Camargo traveled to the North Door and the East Rotunda Doors, where he called police officers "pussies" and obtained part of a lock mechanism from one of the doors.

**B. Camargo's History and Characteristics**

As set forth in the PSR, Camargo does not have a criminal history and he has complied with the conditions of his pretrial release since his last Pretrial Violation Report in March 2022. ECF No. 155 at ¶¶ 11, 57. The PSR indicated that he regularly sees a psychiatrist, was diagnosed with bipolar disorder, has a history of hospitalization regarding his mental health, but was otherwise found competent in 2023. ECF No. 155 at ¶ 68-70.

**C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on

our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

**D. The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Camargo's actions on January 6, 2021, indicate the need for a sentence that provides specific deterrence. Camargo did not accept the results of the 2020 presidential election, so he travelled all the way from Florida to Washington D.C., and after the former President's speech on

January 6, joined a violent mob on Capitol grounds, climbed to the Upper West Terrace via the Inaugural Stage, and assaulted Officer Vandayburg. While on the Capitol grounds, Camargo also antagonized officers, threw objects at them, screamed at them, took photos and videos, and later bragged about his conduct regarding the metal piece from the North Door on social media, saying he "got it himself." This behavior shows his conduct was not a momentary lapse in judgement, but instead a willful and alarming disregard of the chaos and violence that surrounded him. Camargo's decisions that day makes it clear that a sentence involving incarceration is needed to successfully deter Camargo from such thoughtless behavior in the future.

With the 2024 presidential election approaching and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence Camargo in a manner sufficient to deter him, and others generally, from going down that road again.

**E. The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Camargo based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Camargo was found guilty of Counts Two and Three of the Indictment, charging him with violations of 18 U.S.C. § 111(a) and 18 U.S.C. § 1752(a)(1). These offenses are Class A misdemeanors. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

There are multiple non-violent misdemeanor defendants who received significant sentences after conviction at trial. Camargo's actions, in contrast, were violent and his sentence should reflect the seriousness of his conduct. In *United States v. Russell Alford*, 21-cr-363 (TSC), the defendant was sentenced to 12 months for his non-violent misdemeanor conduct at the Capitol. Alford went inside the building, made multiple posts on social media, tried to minimize the seriousness of his conduct, and was not honest at trial. Alford's sentence of 12 months reflected the seriousness of his conduct. In *United States v. Antony Vo*, 21-cr-509 (TSC), the defendant was sentenced to 9 months imprisonment for non-violent misdemeanor conduct – entering the building and staying inside for nearly 30 minutes. Camargo's conduct is far more egregious than a misdemeanor defendant who entered the Capitol on January 6. Camargo's conduct deserves a significant sentence because he spat at officers multiple times, taunted them, threw a bottle at them,

and was convicted of assault at trial. Camargo's case while in some ways similar because he was convicted of misdemeanors, has more aggravating factors that warrants a guidelines sentence.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VII.   Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110

Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Camargo was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of

full restitution without respect to a defendant's ability to pay.[5]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Camargo to pay $500 in restitution for his convictions on Counts Two and Three. This amount fairly reflects Camargo's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging

[5] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII. Fine

The defendant's convictions for violations of 18 U.S.C. § 111(a) and 1752(a)(1) subject him to a statutory maximum fine of $100,000 for each count. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's case was referred to the Probation Office for an abbreviated presentence report reflecting only the defendant's criminal history and guidelines computation; therefore, no information was available concerning the defendant's ability to pay a fine. PSR at ¶ 76. However, it is the government's understanding that the defendant's employment account with Instacart was deactivated. PSR at ¶ 74. Therefore, it is likely that the defendant is unemployed and is unable to be able to pay a fine.

## IX. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Camargo to 12 months of incarceration, 1 year of supervised release, $500 in restitution, and a special assessment of $25 for each class A misdemeanor. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Camargo's liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY: /s/ Nialah S. Ferrer
Nialah S. Ferrer
Assistant United States Attorney
New York Bar No. 5748462
601 D Street, NW
Washington, D.C. 20530
(202) 557-1490
Nialah.Ferrer@usdoj.gov